This cause is before us on a petition for a writ of mandamus filed by defendants, Charter Retreat Hospital, Inc., (hereinafter "Charter Retreat"), Charter Medical Corporation (hereinafter "CMC"), and Coosa Valley Youth Services, Inc. (hereinafter "Coosa Valley"), seeking to reverse the trial court's order denying their motions to transfer the case from Jefferson County. We affirm the trial court's order and deny the writ.
This petition arises out of a negligence action filed by Annie Kellum and Barbara Lemmond Sanders, administratrices of the estate of DeWayne Keith Lemmond, against Charter Retreat, CMC, and Coosa Valley. This action is predicated upon the death of DeWayne Keith Lemmond, which occurred while he was an inmate in the Coosa Valley detention center. The plaintiffs alleged that on or about September 24, 1986, the decedent, age 15 years, died as a result of asphyxiation by hanging while in the custody and under the negligent supervision, care, and treatment of defendants. Plaintiffs sued in Jefferson County, and the defendants moved to have the case transferred to Morgan County, asserting that venue was improper as to defendant CMC, a foreign corporation, because it did not do business in Jefferson County. The trial court denied the defendants' motions; hence, this petition.
The facts relevant to this petition, as revealed in the pleadings and depositions filed with the trial court, indicate that defendant Charter Retreat is an Alabama corporation and a wholly-owned subsidiary of defendant CMC. Charter Retreat has its principal place of business in Morgan County, but it also operated a counseling center in Jefferson County at the time the plaintiffs filed this action.[1] Defendant CMC is a foreign corporation, qualified to do business in Alabama, with a statutory agent in Montgomery County and with wholly-owned subsidiary corporations operating in Morgan, Mobile, Houston, and Jefferson Counties at the time this suit was filed. Defendant Coosa Valley is an Alabama non-profit corporation located in Calhoun County.
The ultimate question to be decided by this Court is whether CMC, a foreign corporation qualified to do business in Alabama, was doing business in Jefferson County for the purpose of venue under Code 1975, § 6-3-7, by virtue of the fact that its wholly-owned subsidiary, Charter Retreat, was doing business there? The *Page 789 
answer to this question depends upon the resolution of two underlying issues: 1) whether the evidence is sufficient to support a finding that Charter Retreat acted, for venue purposes, as an agent doing business in Jefferson County for its parent corporation, CMC; or 2) whether the evidence is sufficient to support a finding that Charter Retreat was doing business in Jefferson County as merely the alter ego of its parent corporation, CMC? If either question is answered in the affirmative, then venue is proper as to CMC in Jefferson County.
The burden of proving improper venue is on the party asserting the issue. Ex parte Ralston, 519 So.2d 488, 490 (Ala. 1987); Ex parte Finance America Corp., 507 So.2d 458, 460 (Ala. 1987); Ex parte Harrington Mfg. Co., 414 So.2d 74, 76 (Ala. 1982). We will not grant a writ of mandamus with respect to an order transferring a case or denying a transfer unless there is a clear showing of error by the trial court. Ralston, 519 So.2d at 490; Finance America, 507 So.2d at 460; HarringtonMfg., 414 So.2d at 76.
Code 1975, § 6-3-7, controls the determination of the proper venue for an action brought against a foreign corporation, and it provides in pertinent part as follows: "A foreign corporation may be sued in any county in which it does business by agent. . . ." This provision is consistent with Ala. Const. 1901, Art. XII, § 232, which provides that a foreign corporation may be sued "in any county where it does business, by service of process upon an agent anywhere in the state." Under these provisions, the law is clear that a foreign corporation must be doing business in a given county at the time the suit is filed in order for venue to be proper there.Ex parte Miltope Corp., 522 So.2d 272 (Ala. 1988); Ex parteReliance Ins. Co., 484 So.2d 414, 416 (Ala. 1986); May v.Strickland, 235 Ala. 482, 483, 180 So. 93, 94 (1938).
We now address the first underlying issue: whether the evidence supports a finding that Charter Retreat, a wholly-owned subsidiary of CMC, acted, for venue purposes, as an agent doing business for CMC in Jefferson County. It is undisputed that CMC has no other venue connections with Jefferson County. CMC argues that the mere fact that a wholly-owned subsidiary does business in a particular county does not, as a matter of course, establish that the parent is doing business by agent in that county. We agree. However, we have recognized that a corporation may be engaged in business transactions through the agency of a subsidiary corporation just as through any other agency. Ledlow v. Goodyear Tire Rubber Co., 238 Ala. 35, 37, 189 So. 78, 80 (1939). Moreover, in Ex parte Peabody Galion Co., 497 So.2d 1126 (Ala. 1986), we held that the standard for testing agency for venue purposes is different from the standard for testing agency for the purpose of liability. We discussed the standard as follows:
 "The term 'agency' is frequently used to describe an arrangement which does not rise to the level of a principal/agent relationship and which is not governed by the law of respondeat superior. See Black's Law Dictionary, (rev. 4th ed. 1968); and 3 Am.Jur.2d Agency § 2, p. 510. Indeed, that term 'is also often used in statutes or constitutional provisions in a more restricted sense than that commonly given it, and, where so used, its significance must generally be determined by a study of the context.' 2A C.J.S. Agency § 4, p. 557 (1972).
 "Whether an entity is an agent of a foreign corporation, as contemplated by the Constitution and the statute, is not tested by the standard for determining agency in the context of a principal/agent relationship with the attendant burden of the doctrine of respondeat superior (e.g., civil and criminal liability imputed to the principal for the wrongful acts of the agent committed within the scope of the agent's employment). It is tested in the context of the language of the Constitution and the statute."
Id. at 1128-29. Peabody tells us that for the purpose of venue, the element of control, or lack thereof, of the principal over its agent is not determinative. Id. at 1129. *Page 790 
If the entity is the "means" by which the principal is able to do business in a particular county, then the entity is the "agent" of the principal for venue purposes. InPeabody, this Court found that an independent corporation, acting as a distributor of products for another corporation, was an "agent" for the purpose of venue, because it was a "means" by which the principal corporation did business. Id.
The test for determining whether a foreign corporation is "doing business" in a particular county, for venue purposes, is now well established and can be defined as the performance, with some degree of regularity, of some of the business functions for which the corporation was created. See Ex parteJoiner, 486 So.2d 402, 403 (Ala. 1986); Peabody, 497 So.2d at 1129; Reliance Ins., 484 So.2d at 417; and Ex parte Jim SkinnerFord, Inc., 435 So.2d 1235, 1237 (Ala. 1983). While isolated transactions prior to the filing of the suit are inconclusive to show that the foreign corporation was doing business in a particular county when the suit was brought, we have held that "[c]ontinuity may be inferred . . . as existing at the time of suit from a course of business pursued before and proximately thereafter." Peabody, 497 So.2d at 1129 (quoting InternationalCotton Seed Oil Co. v. Wheelock, 124 Ala. 367, 370, 27 So. 517,518 (1899)). See also Harrington Mfg., 414 So.2d 74, 76 (Ala. 1982).
It should be noted that not every act done within the corporate powers of a foreign corporation will constitute doing business within the meaning of the statute. We recognized inInternational Cotton Seed Oil, 124 Ala. at 370-71,27 So. at 518, that in applying the test for doing business "it may not always be easy to distinguish between acts done in the exercise of corporate functions and those done merely within corporate powers."
In the present case, the corporate charter of defendant CMC was not before the trial court and, thus, is not available to this Court. However, the corporate purposes of CMC are disclosed by the evidence, inasmuch as they can reasonably be inferred from the nature of the business in which CMC was engaged at the time this action was filed. Cf. InternationalCotton Seed Oil, supra. It is undisputed that the business of defendant CMC is that of a holding company. It is also undisputed that CMC wholly owns defendant Charter Retreat, which operates outpatient counseling centers in several cities in Alabama. Defendants' own witness, Dr. Perri Palmer, director of Charter Retreat's Birmingham, Huntsville, and Florence counseling centers, described the business purposes of CMC in her deposition as follows:
 "Q. [Plaintiffs' attorney] What is the relationship, based on your understanding, between Charter Retreat Hospital and Charter Medical Corporation?
 "A. [Dr. Palmer] Based on my understanding, Charter Retreat Hospital is a wholly owned subsidiary of Charter Medical Corporation.
". . . .
 "Q. [Plaintiffs' attorney] We understand now. What is Charter Medical Corporation? What is its business?
 "MR. CADDELL: [Defendants' attorney] If you know.
 "A. [Dr. Palmer] I don't think I could answer that appropriately.
 "Q. [Plaintiffs' attorney] All right. Do you know anything about the company, Doctor Palmer?
 "A. [Dr. Palmer] Other than the fact that it's a corporation, very little.
 "Q. [Plaintiffs' attorney] Where is its principal place of business?
"A. [Dr. Palmer] Macon, Georgia.
 "Q. [Plaintiffs' attorney] Do you know if Charter Medical Corporation owns any hospitals?
"A. [Dr. Palmer] Yes.
"Q. [Plaintiffs' attorney] How many?
"A. [Dr. Palmer] I don't know. Wait.
 "MR. CADDELL: [Defendants' attorney] She's got a judgment on that. Her best judgment is 80 or 90, but that's just from grapevine information around the. . . .
 "Q. [Plaintiffs' attorney] Okay. I don't need an exact figure. *Page 791 
 "MR. CADDELL: [Defendants' attorney] I would object to the form of the question in that it owns a subsidiary [in] each of these places. I don't think it owns any hospital in its own right. I certainly don't think this witness knows whether it owns any hospital in its own right.
 "Q. [Plaintiffs' attorney] Okay. Whether it operates as a wholly owned subsidiary in these various locations or by some other legal means, is it your understanding that Charter Medical Corporation has some 80 or 90 hospitals throughout the country that it operates or in some way controls?
"A. [Dr. Palmer] Yes.
 "Q. [Plaintiffs' attorney] Based on your knowledge, is there any other business purpose for Charter Medical Corporation? In other words, manufacturing, sales, any other kind of business that it conducts other than the operation of hospitals?
"A. [Dr. Palmer] Not to my knowledge."
(Emphasis added). Defendants also produced the deposition of James R. Thomas, CMC's vice-president of hospital operations, in which Mr. Thomas described the business arrangement between CMC and its wholly-owned subsidiaries as follows:
 "Q. [Plaintiffs' attorney] During the time that you were at Charter by the Sea Hospital, [another of CMC's wholly-owned subsidiary hospitals] would Charter Medical Corporation personnel, from time to time, visit your hospital?
"A. [Mr. Thomas] Yes, sir, they would.
 "Q. [Plaintiffs' attorney] Would that be on some regular basis?
 "A. [Mr. Thomas] I would guess that it would be at least once a quarter.
 "Q. [Plaintiffs' attorney] What was the purpose for those visits?
 "A. [Mr. Thomas] The purpose was to review the operation of the hospital and have an update on what the development of the hospital — how the hospital was being operated, what was being done."
Further questioning of Mr. Thomas revealed the following financial arrangement between CMC and its wholly-owned subsidiary hospitals:
 "Q. [Plaintiffs' attorney] Do you know what the earnings of Charter Medical Corporation are based on?
 "A. [Mr. Thomas] Charter Medical Corporation based on?
 "Q. [Plaintiffs' attorney] Yes. In other words, how does Charter Medical Corporation make money?
 "A. [Mr. Thomas] Well, it makes money — it reports the money made by its subsidiaries, I guess, of each hospital after the financial performance of the hospital was consolidated that ends up being what the medical financial performance is.
 "Q. [Plaintiffs' attorney] Let me see if I can put it in sort of Birmingham lawyer's terms and see if I can get it right.
"A. [Mr. Thomas] Okay.
 "Q. [Plaintiffs' attorney] We've got 70 or 80 hospitals in the Charter Medical Corporation system, —
"A. [Mr. Thomas] Yes, sir.
 "Q. [Plaintiffs' attorney] — each one of which is operated fairly independently by an administrator and his staff but reporting to various people in the Charter Medical organization, correct?
"A. [Mr. Thomas] Correct.
 "Q. [Plaintiffs' attorney] On a monthly basis, you get reports of the operation of the hospitals in your division and you can see over a period of months how these hospitals are doing financially; is that correct?
"A. [Mr. Thomas] That's correct.
 "Q. [Plaintiffs' attorney] At the end of the year, although these hospitals may pay their own taxes and file their own tax returns, any profit that is made by these hospitals collectively is in turn passed on to Charter Medical Corporation?
 "A. [Mr. Thomas] I think that's the case, technically, yes, but I can't swear to it. *Page 792 
 "Q. [Plaintiffs' attorney] You haven't been in Charter Medical Corporation to see the money actually change hands, but that's what you assume occurs, isn't it?
 "A. [Mr. Thomas] Yes, sir. It is. There may be legal entities or something that I don't have any desire or firsthand knowledge of —
"Q. [Plaintiffs' attorney] Right.
 "A. [Mr. Thomas] — but, basically, that's how I understand it."
(Emphasis added). The testimony given by Dr. Palmer and Mr. Thomas indicates that CMC owns approximately 70 to 80 hospitals around the country, including the one operated by defendant Charter Retreat, utilizing the corporate form of the wholly-owned subsidiary. Their testimony also indicates that at least two business purposes of CMC are the ownership and operation, for profit, of these wholly-owned hospitals. It is undisputed that the individual hospitals return their profits to CMC at the end of each year. As aptly pointed out by the plaintiffs, this is how CMC makes its money; this is its business. We would be hard pressed to say that the Charter Retreat counseling center, operating in Jefferson County when this suit was filed, was not a "means" by which CMC performed some of the business functions for which it was created. While not every act done within CMC's corporate powers constituted doing business within the meaning of the statute, the act of receiving profits in the present case was most definitely done in the exercise of certain corporate functions for which CMC was created, and was not merely done within its corporate powers. Therefore, we answer in the affirmative our initial inquiry concerning whether the evidence is sufficient to support the trial court's finding that Charter Retreat acted, for venue purposes, as an agent doing business in Jefferson County for CMC. The disposition of this issue allows us to pretermit consideration of the alternate issue concerning whether Charter Retreat was doing business in Jefferson County merely as the alter ego of CMC.[2] Accordingly, we find that the defendants have not clearly shown error on the part of the trial court in denying their motions to transfer, and, thus, we deny the writ.
WRIT DENIED.
MADDOX, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
HOUSTON and STEAGALL, JJ., dissent.
[1] Pamela McCullough, administrator of Charter Retreat, testified in her deposition that Charter Retreat's counseling center in Jefferson County was operating at the time this action was filed and was still operating in October 1987, approximately five months later.
[2] We are aware of the cases cited by petitioners involving a theory of venue predicated upon a finding that the subsidiary is the alter ego of the parent corporation. Petitioners cite Exparte Baker, 432 So.2d 1281 (Ala. 1983); Duff v. Southern Ry.,496 So.2d 760 (Ala. 1986); and Larrimore v. Hospital Corp. ofAmerica, 514 So.2d 840 (Ala. 1987). We do not question the holdings in those cases; however, we do find them distinguishable from the present case for the following reasons. In Baker, 432 So.2d 1281 (Ala. 1983), this Court determined whether venue was proper by applying theories of "estoppel" and "alter ego," as opposed to an "agency" theory as propounded in Ex parte Peabody Galion Co., 497 So.2d 1126 (Ala. 1986), because "estoppel" and "alter ego" were the only theories argued by the parties. Contrary to the petitioners' argument, Baker does not mandate the use of only the "alter ego" theory. In fact, in Baker, 432 So.2d at 1284, we recognized the existence of yet another theory that was not argued by the plaintiffs, that of "respondeat superior." InLarrimore, 514 So.2d 840 (Ala. 1987), the Peabody "agency" theory once again was not raised and, thus, we decided the venue issue under the theories of "respondeat superior " and "alter ego." The Baker and Larrimore cases should not be taken as precluding other possible theories by which venue might be found to be proper as to a parent corporation based upon the presence of its subsidiary. The final case cited by petitioners, Duff v. Southern Ry., 496 So.2d 760 (Ala. 1986), is not a venue case and concerns only the "liability" of a parent corporation for the acts of its subsidiary under the theory of "alter ego" and, thus, it is inapplicable to the present case.